**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JESSICA TORRES, o/b/o, ALEXANDRA L. CLAUDIO,**

        **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　　　**Case No. 6:04-cv-708-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Jessica Torres on behalf of her minor daughter, Alexandra L. Claudio, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration (SSA). Doc. No. 9. This matter has been referred to me under 28 U.S.C. § 636(c) pursuant to the consent of the parties.

**I.    PROCEDURAL HISTORY.**

On November 2, 2001, Torres filed an application for disability benefits under the Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. § 1382, *et seq*., alleging that Alexandra was disabled as of October 18, 2001. TR. 70-72. Torres' claim was denied initially and upon reconsideration. Torres requested a hearing before an administrative law judge (ALJ). TR. 26-27. She received notices from the SSA advising her that

she was permitted to choose a lawyer or another person to represent her at the hearing. A notice indicated that "[s]ome private lawyers charge a fee only if you receive benefits," but it did not advise her that the fee would be limited to no more than 25% of any past-due benefits awarded. TR. 26. The notice refers to an enclosed leaflet about the right to representation, but the leaflet is not part of the record.

An ALJ held the requested hearing on October 29, 2003. TR. 28-51. Torres was not represented at the hearing. Torres and Alexandra both testified at the hearing. *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Alexandra had not engaged in any substantial gainful activity. TR. 13. The ALJ concluded that the medical evidence indicated that Alexandra suffered from seizure disorder, controlled with Trileptal;[1] thalassemia;[2] "speech/language delay – getting therapy; and behavioral problems – getting therapy." *Id*. The ALJ determined that Alexandra's impairments did not meet or medically equal the criteria of any of the impairments listed in the applicable social security

---

[1] Trileptal is used alone or in combination with other medications to treat certain types of seizures in the treatment of epilepsy. *See* MEDLINE PLUS, www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601245.html (last visited August 22, 2005).

[2] Thalassemia is "[n]ot just one disease but rather a complex series of genetic (inherited) disorders all of which involve underproduction of hemoglobin, the indispensable molecule in red blood cells that carries oxygen. . . . In thalassemia, there is a mutation (change) in one of the types of globin chains. Depending upon which globin chain is affected, the mutation typically leads to underproduction (or absence) of that globin chain, a deficiency of hemoglobin, and anemia." MEDICINENET.COM, www.medterms.com/script/main/art.asp?articlekey=5750 (last visited August 22, 2005).

regulations.[3] TR. 15. The ALJ relied heavily upon the opinions of two physicians that reviewed Alexandra's records at the request of the SSA in reaching this conclusion. *Id*. The ALJ further determined that Alexandra's impairments were not functionally equivalent to a listed impairment. Hence, the ALJ found that Alexandra was not disabled. TR. 19.

The ALJ evaluated the functional equivalence of Alexandra's impairments under six domains, namely: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. TR. 16-19.[4] The ALJ found no evidence of limitation in any of the first five domains. With respect to Alexandra's "health and physical well-being," the ALJ found that the evidence revealed "a less-than-marked limitation in this area." TR. 19. The ALJ did not articulate precisely what evidence he considered when evaluating the functional equivalence of Alexandra's impairments; however, he did preface his analysis with a general statement that his "discussion of limitations takes into consideration the effect of all of the claimant's impairment(s), whether or not mentioned by name." TR. 14. In addition, the ALJ found that Torres' allegations concerning her daughter's impairments and resulting functional limitations were exaggerated and not completely credible. TR. 15-16, 19.

---

[3] The Code of Federal Regulations "contains a Listing of Impairments ['the Listings,' found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories. *See* [20 C.F.R.] § 416.925(a). . . ." *Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004).

[4] *See* 20 C.F.R. § 416.926a(b)(1).

Torres requested review of the ALJ's decision by the Appeals Council. TR. 7. On March 25, 2004, the Appeals Council denied Torres' request for review. TR. 4-6. This timely appeal followed. Doc. No. 1.[5]

## II. JURISDICTION.

The Commissioner of the SSA issued a final decision after a hearing with respect to Torres' application for disability benefits under SSI. Therefore, the Court has jurisdiction over this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III. STATEMENT OF FACTS.

Alexandra was born on June 12, 2000. TR. 40. At the time of the hearing, she was in pre-kindergarten in a classroom with students of varying exceptionalities. TR. 41, 127.

Alexandra suffered from a seizure disorder. TR. 41, 108-09. The seizures began with Alexandra complaining of pain in her stomach and her head. As a result of the seizure she would vomit. TR. 42. Playing too much or crying too much could bring on a seizure. TR. 42. During a seizure, Alexandra's eyes rolled up and she shook and threw herself about. After a seizure, Alexandra was tired and would sleep the whole day. TR. 44. Torres testified that Alexandra suffered a seizure once every three to four months and that her seizures usually last two to three seconds each. TR. 42, 44. In addition, Torres indicated that Alexandra suffered larger seizures, which last two to three minutes, once every five to six months. TR. 44-45. Alexandra was taking Trileptal for her seizure disorder, TR. 43, but Torres testified that Alexandra was, nevertheless, having seizures more often. TR. 41.

---

[5] Torres is represented by counsel in connection with her appeal to this Court.

Alexandra also had a history of behavioral problems. TR. 41, 45, 114, 192-93. She did not have any friends other than her sister. TR. 38. Torres testified that Alexandra could not stay still and "fusses with the kids." TR. 41. Torres had been called twice to pick Alexandra up from school because she was "getting wild." TR. 43. On one occasion in particular, she poured juice on top of a classmate's head. TR. 47. She was punished at school with "time outs" quite frequently. *Id*.

Torres testified that Alexandra was difficult to understand. TR. 48. She was in a class to help her with her behavior and speech. TR. 41.

Alexandra's behavior was also troublesome outside of school. When Torres took Alexandra shopping, Alexandra screamed and hollered. She was punished with a "time out." TR. 46. Alexandra did not respond well to commands from adults. TR. 49. Specifically, Torres testified that Alexandra hit her with her fists whenever she tried to "tell her something[.]" *Id*.

Alexandra also had trouble with her left foot, and she tripped over herself occasionally. TR. 48. She had been examined at "UPC" or "UCP," and Torres was told "it's not a big develop for her." TR. 48. Torres testified that Alexandra had an appointment with a pediatrician and a neurologist scheduled for dates after the hearing. TR. 50. Written reports reflect that Alexandra's pediatrician was Raymond F. Caron[6], TR. 86, and Orange County Pediatrics, TR. 87.

The medical records reflect that Alexandra's seizures began in December 2000. TR. 191. In May 2001, she was treated at Orlando Regional Medical Center (ORMC), for vomiting arising from new onset seizures. TR. 150-51.

---

[6] Or Raymond Carson. *See* TR. 191.

On August 24, 2001, Alexandra was treated for a "possible seizure" at ORMC. TR. 185-86. She was diagnosed with "convulsions NEC."[7] TR. 185. Treatment notes reflect that Alexandra had been seen at ORMC the previous month for seizures, but records of treatment in July 2001 are not in the record. TR. 186.

On October 12, 2001, Ron Davis, M.D., a neurologist, examined Alexandra, and wrote his observations to Dr. Raymond Carson.[8] TR. 191-93. Dr. Davis noted that Alexandra had her third seizure in September 2001. TR. 191. Dr. Davis' impression was that Alexandra had new onset focal seizure disorder, most likely caused by idiopathic epilepsy. TR. 192-93. Dr. Davis prescribed Topamax.[9] *Id.*

On October 24, 2001, Alexandra was treated for a seizure at ORMC. TR. 179. The treating physician noted that Alexandra's seizure was of moderate severity with a sudden onset. Treatment notes reflect that Alexandra was sleepy following the seizure. TR. 179. She was diagnosed with "convulsions NEC." TR. 178. Her medication was increased. TR. 180, 182.

On November 12, 2001, Dr. Davis conducted a follow-up exam of Alexandra. TR. 188-90. Dr. Davis noted that Alexandra had recently suffered another focal seizure and that she was having

---

[7] NEC is a medical abbreviation for either "no essential change" or "not elsewhere classified or coded." *See* Dan J. Tennenhouse, MD, JD, FCLM, Attorney's Medical Deskbook 3d (2004), found on Westlaw at MEDDESK § 5:3.

[8] Elsewhere in the record, this physician's name is written as "Raymond Caron, M.D." TR. 200. There are no records of this physician's treatment of Alexandra in the transcript.

[9] "Topamax is used with other medications to treat certain types of seizures in patients with epilepsy . . . . [Topamax] is used to treat patients who continue to have seizures even when they take other anti-seizure medications." *See* MEDLINE PLUS, www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697012.html (last visited August 22, 2005).

difficulty taking her medication. TR. 188. Dr. Davis further noted that a neurological exam revealed, among other things, that Alexandra was "awake, alert, attentive, interactive, playful and engaging." *Id*. In light of the difficulties Alexandra was experiencing with Topamax, Dr. Davis prescribed Trileptal. TR. 189.

On December 24, 2001, E. Cuevas, M.D., reviewed Alexandra's records at the request of the SSA and prepared a Childhood Disability Evaluation Form. TR. 194-99. In sum, Dr. Cuevas determined that Alexandra's impairments were severe but that they did not meet, medically equal or functionally equal any of the impairments contained in the applicable social security regulations. TR. 194. Dr. Cuevas found that Alexandra had marked limitations in the domain of health and physical well-being based on focal seizure disorders, but no limitation in any other domain. TR. 196, 198.

Alexandra was seen by Dr. Davis again on March 12, 2002. TR. 200. Dr. Davis noted, among other things, that Alexandra had been seizure free since she began to take Trileptal, although she had occasional episodes of dizziness. *Id*. Dr. Davis increased the dosage of Alexandra's medication because the dizziness might be indicative of partial seizure breakthroughs. TR. 200.

On May 11, 2002, Debra M. Ashcraft, M.D., reviewed Alexandra's records at the request of the SSA and prepared a Childhood Disability Evaluation Form. TR. 202-07. Like Dr. Cuevas, Dr. Ashcraft determined that Alexandra's impairments were severe but that they did not meet, medically equal or functionally equal any of the impairments contained in the applicable social security regulations. TR. 202. In addition, Dr. Ashcraft found that Alexandra had marked

limitations in the domain of health and physical well-being based upon her seizure disorder, but apparently no limitations in other domains. TR. 204-05.[10]

On May 7, 2003, Alexandra was evaluated by the Orange County Public Schools System Early Intervention Service. TR. 118-21. Lisa Moore, an educational diagnostician, observed that Alexandra was happy, active, and difficult to engage with a short attention span. TR. 118. Moore concluded that Alexandra's skills were age appropriate in the areas of gross and fine motor and cognition, and that her skills were "emerging" in the areas of personal-social, adaptive, and receptive and expressive language skills. TR. 119-20.

A speech-language assessment was performed by Enid E. Torres, a speech pathologist. TR. 117. Alexandra was not able to complete the articulation test because she became frustrated. She had 46% distorted and unintelligible speech, which was rated as severe, and the overall articulation test was rated as moderate to severe. TR. 117. Torres recommended articulation and language therapy. TR. 123. Alexandra met the criteria for speech/language impaired programs. TR. 124.

A Battelle Developmental Inventory test[11] was administered. TR. 121. The test revealed that Alexandra was functioning at an overall age equivalent of 28 months.[12] *Id*.   Moore

---

[10] Dr. Ashcroft indicated that the domain of attending and completing tasks was not applicable. TR. 204.

[11] The Battelle Developmental Inventory test is administered to children six months to eight years old and includes subtests which measure fine and gross motor, adaptive, personal-social, receptive and expressive language, and cognitive skills.

[12] Alexandra was approximately 35 months old when the test was administered.

determined that Alexandra's "[s]kills are age appropriate in the motor and cognitive domains[,]" and that she had weaknesses "with demonstrating appropriate play skills, following a daily routine, avoiding common danger, attending to small group activities and answering simple questions." *Id*. Moore noted that Alexandra "required redirection back to task, forced eye contact and repetition of verbal commands before following through." *Id*. Moore concluded that Alexandra met the diagnostic criteria for the "Developmentally Delayed program." *Id*.

The individualized education plan prepared by the school for Alexandra reflects that Alexandra's impairments would effect her participation in the general curriculum as follows: "[D]ue to limited exposure to an educational setting Alexandra has difficulty following a daily routine, playing with peers, attending to small group activities, and avoiding common danger[.]" TR. 127.  The stated priorities were "to improve Alexandra's ability to interact with same age peers, follow a daily routine, attend to small group activities, and avoid common danger." *Id*.

On July 23, 2003, Torres reported that Alexandra had several behavioral issues, such as "violent and physically aggressive behaviors in the form of biting, pushing and kicking peers and sibling, as well as not following request[s] by adults . . ." TR. 114.  Torres and Alexandra subsequently participated in several behavioral sessions. A progress summary dated October 28, 2003, stated that Alexandra was "making progress in achieving goals for successful discharge in three months."  TR.  114.  The progress report further indicated that Torres had "shown skillful implementation of the behavioral program and various strategies which have effectively reduce[d] the frequencies of both aggression and noncompliance." *Id*.

-9-

On June 9, 2003, Dr. Davis examined Alexandra and noted that her blood levels indicated the presence of thalassemia. TR. 208. Dr. Davis further noted that Alexandra was tolerating the Trileptal he had prescribed with no significant side effects. *Id*. He prescribed Diastat for use with any significant breakthrough seizures. TR. 208.

**IV. STANDARD OF REVIEW.**

The process for determining whether a child is disabled "begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [the child] is considered 'not disabled' and is ineligible for benefits. 20 C.F.R. §§ 416.924(a), (b)." *Shinn.*, 391 F.3d at 1278. "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [the child] has 'an impairment or combination of impairments that is severe.' [20 C.F.R.] § 416.924(a), (c)." *Id.* A "physical or mental impairment" under the terms of the Act is one that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 416.908.

If the child has a severe impairment, "the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child. 20 C.F.R. §§ 416.911(b), 416.924(d). Limitations arising from pain count in this determination. *Id.* § 416.924(a)." *Shinn*, 391 F.3d at 1278. The impairment "must 'be expected to cause death or . . . last for a continuous period of not less than 12 months.' 20 C.F.R. § 416.906; *see also id.* § 4316.909." *Shinn*, 391 F.3d at 1279.

"A child's impairment is recognized as causing 'marked and severe functional limitations' if those limitations' meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings.' [20 C.F.R.] § 416.911(b)(1); *see also* §§ 416.902, 416.924(a)." *Shinn*, 391 F.3d at 1278. "Limitations appearing in these listings are considered 'marked and severe.' *Id.*" *Shinn*, 391 F.3d at 1278.

If the child's impairments do not meet or equal a listed impairment, the ALJ can still conclude that the child's impairments are functionally equivalent to those in the Listings. "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities." *Shinn*, 391 F.2d at 1279. The Code of Federal Regulations specifies six major domains of life that the ALJ should consider, namely: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). The Regulations further provide benchmarks that children should have achieved by certain ages.

"A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked limitations in two of the domains . . . , or an extreme limitation in one domain.' [20 C.F.R.] § 416.926a; *see also* [20 C.F.R.] § 416.925." *Shinn*, 391 F.3d at 1279.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.    ANALYSIS.**

Torres raises two issues on appeal. First, Torres contends the ALJ erred by failing to develop the record fully particularly in light of Torres' lack of representation at the hearing. Specifically, Torres asserts that the ALJ should have ordered a consultative exam to explore the extent of Alexandra's impairments and should have obtained records from all of Alexandra's treating physicians. Next, Torres argues that the ALJ's determination that Alexandra's impairments were not "functionally equivalent" to a listed impairment is not supported by substantial evidence.   These are the only issues I will address.

When a claimant is not represented by counsel, and does not effectively waive the right to be represented, the ALJ has a special duty to develop the record fully. *See Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). As a matter of law, Torres did not effectively waive her right to be represented because the record does not reflect that she was informed that a lawyer could not obtain as attorney's fees more than 25% of any past-due benefits awarded. *See Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991). Therefore, Torres contends, the ALJ had a special duty to obtain records from Alexandra's pediatricians, from the location where Alexandra was examined regarding problems with her foot, and records of the doctor's visits that were scheduled to occur shortly after the hearing was held. Additionally, she asserts that the ALJ should have required an examination by a consulting physician regarding Alexandra's ability to function in the six domains that the ALJ was required to consider.

The Commissioner correctly asserts that even in the event of an ineffective waiver of counsel, the ALJ's failure to gather the missing treatment records does not require reversal unless failure to do so would result in unfairness or clear prejudice. *See Brown*, 44 F.3d at 935. There is support in the record to suggest that the missing records might fill evidentiary gaps and could result in a different assessment of Torres' credibility and the degree of Alexandra's functional limitations. Torres testified in October 2003 that Alexandra was having seizures more often. This is inconsistent with the ALJ's finding, based on Dr. Davis' last report dated June 2003, that Alexandra was doing well on her medication. Missing treatment records from Alexandra's pediatricians and the records of the visit to Dr. Davis scheduled to occur after the hearing may have supported Torres testimony that the seizures had recurred.

Of further note in this regard is the ALJ's failure to explain why he relied on the opinions of the reviewing physicians in reaching his conclusion regarding whether Alexandra's condition met or equaled a listed impairment, then ignored the conclusion that Alexandra had marked limitations in the domain of health and well-being.  Failure to consider all of the evidence in the record is as prejudicial as failure to gather all relevant evidence.  *See Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985).

The Commissioner contends that even if Torres established prejudice from the ALJ's failure to develop the record fully, the error is harmless because the evidence does not support a finding that Alexandra had a marked limitation in a domain other than health and well-being.  This argument is inconsistent with the law of the circuit, which provides that the Court is not required to find that violation of the special duty to develop the record "'would necessarily have resulted in any specific benefits in the handling of the case before the ALJ.'"  *See Brown,* 44 F.3d at 935 (quoting *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. Unit B July 17, 1981)).

Finally, the record reflects that Alexandra had moderate to severe limitations in speech and articulation and that she had behavioral problems.   These are factors to be considered when addressing the domains of acquiring and using information and interacting and relating to others. *See Kittles v. Barnhart*, 245 F. Supp. 2d 479, 489 (E.D.N.Y. 2003).  Torres correctly notes that school personnel concluded that Alexandra's speech/articulation and behavioral problems would effect her participation in the general curriculum, which resulted in Alexandra being placed in a program for students of varying exceptionalities.

The ALJ apparently concluded that Alexandra had no limitations arising from her speech and behavioral problems solely because she was receiving therapy and "making progress in achieving goals for successful discharge (Exhibit 8E)." TR. 15. "Making progress" does not, of

course, equate to resolution of the problem. Indeed, Torres' testimony, if credited, showed that Alexandra still had tantrums. Moreover, the progress resulting from therapy was made two years after the alleged onset date of Alexandra's disability. The results of therapy conducted in 2003, even assuming the results are sufficient to establish no or less-than-marked limitations in the applicable domains, cannot apply when assessing whether Alexandra had limitations in these domains at any time after the alleged disability onset date and before the therapy began.

In sum, Torres waiver of her right to representation was not effective, and the ALJ did not perform his "special duty" to gather all of the relevant evidence. Accordingly, reversal is required to permit the ALJ to gather all relevant information and, if appropriate, to order a consultative evaluation concerning the functional equivalence of Alexandra's impairments under the six major domains of life set forth in 20 C.F.R. § 416.926a(b)(1).

## VI.   CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings. The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 23rd day of August, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties